

                United States Attorney
                Northern District of California

*11th Floor, Federal Building*       *415-436-7200*
*450 Golden Gate Ave., Box 36055*
*San Francisco, CA 94102-3495*      *FAX: 415-436-7234*

April 16, 2024

John T. Philipsborn
507 Polk St., Suite 350
San Francisco, CA 94102
jphilipsbo@aol.com

Re: *United States v. Juan Soto*, Case No. 21-CR-328 YGR

Dear Mr. Philipsborn:

      Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure and the Court's Pretrial Scheduling Order (ECF No. 1016), this letter summarizes the testimony the government intends to elicit under Rules 702, 703, and/or 705 of the Federal Rules of Evidence during its case-in-chief at trial:

1. FBI Special Agent Digital Forensic Examiner Scott Medlin
2. Special Agent Edgar Ramos, California Department of Corrections and Rehabilitation
3. Senior Forensic Chemist Jonathan S. Park, Drug Enforcement Administration
4. FBI Computer Forensic Examiner Amanda R. Chung

      Each witness's expected testimony follows our signatures.  The government reserves the right to identify additional experts and to supplement these disclosures as appropriate before trial or to call additional experts for purposes of rebuttal or impeachment.

Pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, the government hereby requests disclosure by the defense of any testimony it intends to present under Rules 702, 703, and/or 705 of the Federal Rules of Evidence.

Sincerely,

MARTHA BOERSCH
Chief, Criminal Division


_____/s/_____
MARJA-LIISA OVERBECK
LEIF DAUTCH
ASEEM PADUKONE
Assistant United States Attorneys


Cc:    Filed electronically (ECF)

### FBI Special Agent Digital Forensic Examiner Scott Medlin

The government intends to reach out to you regarding proposed stipulations, including stipulating to the authenticity of the extractions done on defendant James Perez's cellphone and simcards, produced at NF CDCR-0018212 (earlier versions of the cellphone extraction also were produced at NF RVR-0000642 and NF RVR-0001176). If the defense is unwilling to reach such a stipulation, then the government intends to call Special Agent Digital Forensic Examiner Medlin.

Special Agent Digital Forensic Examiner Medlin's qualifications are summarized in his curriculum vitae, which has been produced at EXPERT-0000025-EXPERT-0000027. Special Agent Digital Forensic Examiner Medlin has been employed by the FBI for nearly 16 years and has worked as an FBI Computer Analysis Response Team (CART) Digital Forensic Examiner (DFE) for approximately thirteen years. As a CART DFE, Special Agent Digital Forensic Examiner Medlin has received training in the forensic acquisition of digital evidence, and the application of concepts and methodologies of digital forensics to perform examinations and produce results for court proceedings. As a CART DFE, Special Agent Digital Forensic Examiner Medlin has received training in Microsoft Windows Forensic Analysis; Apple macOS and iOS Forensic Analysis; UNIX/Linux Forensic Analysis; Mobile Device Forensic Analysis; and Memory Forensic Analysis. Special Agent Digital Forensic Examiner Medlin has extensive experience in the preservation, retrieval, analysis, and documentation of data from electronic devices, including mobile devices, computer hard drives, and external storage drives/devices. As set forth in his enclosed CV, Special Agent Digital Forensic Examiner Medlin has testified as an expert on device extractions and forensic analysis once in the past four years. Special Agent Digital Forensic Examiner Medlin has received trainings on how to perform electronic device extractions and has generated and/or verified over 3,000 extractions in the course of his career. He is familiar with the programs used to create cellphone extractions, Graykey, and to parse the extraction, Cellebrite.

Based upon his knowledge, skill, training, and experience related to electronic data extraction, including data as found on cellular devices, Special Agent Digital Forensic Examiner Medlin may provide expert opinion testimony regarding: (1) his knowledge, skill, training, and experience with the extraction of data from cellular devices; (2) his extraction and/or review of the extraction process for the raw data on cellular or other electronic devices seized in connection with this case that have or will be made available to you in discovery.

With respect to these extractions, we anticipate Special Agent Digital Forensic Examiner Medlin's direct examination will include the following:

1. Special Agent Digital Forensic Examiner Medlin is expected to testify regarding the process for extracting data from the cellular/electronic devices (to include external storage devices), and to provide his opinion that the data extractions performed in this case are reliable and authentic, and that all data extracted from the devices were on the devices themselves.

2. Special Agent Digital Forensic Examiner Medlin is expected to testify that forensic software creates an accurate and reliable image/extraction of digital devices, and that he has regularly relied on these tools to create accurate and reliable forensic images and extractions in the past.

3. Special Agent Digital Forensic Examiner Medlin is expected to testify that the forensic imaging/extraction process used in this case was complete and accurate because the forensic software generated and assigned a hash value to the forensic image/extraction and verified the image/extraction by hash to be an exact duplicate of the original.

The bases and reasons for Special Agent Digital Forensic Examiner Medlin's testimony are his education, training, experience, and familiarity with (i) electronic media devices including cellular devices and external storage drives/devices, and (ii) cellular data and electronic device extraction and authentication. The bases and reasons for his opinions also may include the reports of law enforcement agents involved in this investigation.

\*   \*   \*

Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G)(v), I approve this disclosure of my expected testimony.

_____
SCOTT MEDLIN
Special Agent Digital Forensic Examiner,
FBI

**GOVERNMENT'S GANG EXPERT DISCLOSURE**

I.     **SUMMARY OF TESTIMONY OF SPECIAL AGENT EDGAR RAMOS**

    A.     **Qualifications**

Senior Special Agent Edgar Ramos' qualifications, training, and experience are generally described below and in his *curriculum vitae*, which has been produced at EXPERT-0000004—EXPERT-0000015.

SSA Ramos has worked for the California Department of Corrections and Rehabilitation (CDCR) since 2003. Since 2018, he has worked as a Special Agent with CDCR. His duties include, but are not limited to, overseeing departmental gang management policy and conducting major criminal investigations, with a focus on gang activity. From 2017 until 2018, he worked as a Correctional Lieutenant with the Office of Correctional Safety in the Gang Intelligence Operations Unit. His duties included, but were not limited to, overseeing unit staff and field operations, and conducting sensitive and complex gang related investigations. Prior to that, he worked under the direction of the Correctional Lieutenant in the Gang Intelligence Operations Unit as a Correctional Sergeant, where he facilitated Security Threat Group-1/prison gang members and associates participating in the CDCR's debriefing process by gathering intelligence and authenticating information provided during debriefs (2012-2017). Prior to that, he was the supervisor for CMF's Investigative Services Unit and gang/Security Threat Group unit. His duties included, but were not limited to, supervising all investigations within the prison and approving all gang validations prior to their submittal to the Office of Correctional Safety's Special Services Unit (2010-2012). From 2009 to 2010, SA Ramos was a Correctional Sergeant at the CMF-State Prison in Vacaville, California. Prior to that, he was an Assistant Institutional Gang Investigator in the Investigative Services Unit at Mule Creek State Prison, in Ione, California. His duties included, but were not limited to, investigating, monitoring, and documenting gang members and their illegal activities within the prison (2007-2009). Prior to that, he was as a Correctional Officer at Mule Creek State Prison 2003-2007). SSA Ramos is a graduate of the Richard A. McGee Correctional Training Academy. He has attended numerous gang related trainings, gives gang presentations to correctional staff, and has been an instructor at numerous gang conferences.

In 2017, Ramos was qualified and testified as a gang expert in the area of *Nuestra Familia* and the Northern Structure prison gang in *People v. Matthew John Capanis*, Contra Costa County Superior Court Case Number 51319284.

    B.     **The Witness's Opinions and Bases for His Opinions**

The government intends to call Senior Special Agent Edgar Ramos as a gang expert. He will testify about the practices, rules, graffiti, slang, code, and colors of the *Nuestra Familia* prison gang. SSA Ramos will specifically testify to the following:

1) The membership of NF is composed of a relatively small number of members, known as "carnales" or "Cs," who control the gang and handle important managerial decisions.

The bases for this opinion are:
- My numerous interviews with active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading confiscated NF documents, such as: NF educational materials, the NF Constitution, the 14 Bonds, kite communications.
- My direct/real-time participation in investigations of NF and *Norteño* gang members, dating back to 2007.
- Attending gang educational conferences.
- Reading numerous debriefs of active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading law enforcement reports (such as gang validation reports and gang intel reports) and training materials relating to NF and *Norteño* gang members.
- Talking to other experienced gang investigators within CDCR and outside law enforcement agencies.

2) As a response to the prison gang problem in the California prison system, the CDCR initiated its Secure Housing Units ("SHU") programs in its prison facilities. The CDCR identified prison gang leaders in a particular facility, removed them from the prison's mainline housing units, and placed them into segregated SHU cells. The goal of the SHU programs was to limit the influence of prison gang leaders by isolating them, thereby restricting their communications and their ability to direct criminal activities of other gang members in and out of CDCR custody.

The bases for this opinion are:
- My experience working for the CDCR for twenty years, including my direct experience with the SHU.
- Attending CDCR training classes.
- Speaking to experienced CDCR officials, including Pelican Bay State Prison Gang Investigators that worked in the SHU prior to my tenure with CDCR.

3) In 2015, the CDCR released all the residents of the Pelican Bay SHU into less stringent housing, which allowed them the ability to freely communicate and associate with other inmates. Once released from the Pelican Bay SHU, it became much easier for these inmates to gain access to contraband cellphones.

The bases for this opinion are:
- My experience working for the CDCR for twenty years, including my direct experience with the SHU.
- Attending CDCR training classes.
- Speaking to experienced CDCR officials, including Pelican Bay State Prison Gang Investigators that worked in the SHU prior to my tenure with CDCR.
- My numerous interviews with active and non-active NF and *Norteño* gang members, as well as gang dropouts.

- My personal observations and watching surveillance video from custodial institutions.

    4) Norteños are gang members who are generally from Northern California, who fall under the umbrella of the NF in that Norteños pledge their allegiance to the NF. Norteño is Spanish for "northerner" and originated as a reference to northern California.

The bases for this opinion are:
- My numerous interviews with active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading confiscated NF documents, such as: NF educational materials, the NF Constitution, the 14 Bonds, kite communications.
- Talking to other experienced gang investigators.
- Attending gang educational conferences.
- Reading numerous debriefs of active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading law enforcement reports (such as gang validation reports and gang intelligence reports) and training materials relating to NF and *Norteño* gang members.

    5) The NF has a written constitution that sets forth its purpose and ideology, its rules, and its organizational structure.

The bases for this opinion are:
- My numerous interviews with active and non-active NF and *Norteño* gang members, as well as gang dropouts, specifically about the NF Constitution and its meaning.
- Reading confiscated NF documents, such as: NF educational materials, the NF Constitution, including the most recent version seized by CDCR officials in 2016, the 14 Bonds, kites and other intercepted communications.
- Talking to other experienced gang investigators.
- Attending gang educational conferences.
- Reading numerous debriefs of active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading law enforcement reports (such as gang validation reports and gang intelligence reports) and training materials relating to NF and *Norteño* gang members.

    6) Norteños who are part of the Northern Structure refer to each other as "*hermanos*," "bros," "Norteño soldados," or "N-Sols."

The bases for this opinion are:
- My numerous interviews with active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading confiscated NF documents, such as: NF educational materials, the NF Constitution, the 14 Bonds, kites and other intercepted communications

- Talking to other experienced gang investigators.
- Attending gang educational conferences.
- Reading numerous debriefs of active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading law enforcement reports (such as gang validation reports and gang intelligence reports) and training materials relating to NF and *Norteño* gang members.

   7) Upon arrival at a Norteño housing unit, the gang requires each Norteño to provide his information commonly referred to as a New Arrival questionnaire. This information is then disseminated in the facility to vet the new arrival's standing within the gang. The vetting process is meant to identify informants, rival gang members, and members who have violated gang rules or not in good standing. Once cleared, the new arrival becomes an active member of the housing unit, which is often referred to as the "Household."

The bases for this opinion are:
- My personal observations and watching surveillance video from custodial institutions.
- Reading confiscated New Arrival Questionnaires.
- My numerous interviews with active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading confiscated NF documents, such as: NF educational materials, the NF Constitution, the 14 Bonds, kites and other intercepted communications.
- Talking to other experienced gang investigators.
- Attending gang educational conferences.
- Reading numerous debriefs of active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading law enforcement reports (such as gang validation reports and gang intelligence reports) and training materials relating to NF and *Norteño* gang members.

   8) If a NF member has a serious rules violation, he may be subject to "removal." The NF teaches that the goal of a "removal" is murder. Serious rule violations could include "red-on-red" violence, claiming improper authority, attempting to disassociate from the gang, or stealing from the gang.

The bases for this opinion are:
- My personal observations and watching surveillance video from custodial institutions.
- My numerous interviews with active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading confiscated NF documents, such as: NF educational materials, the NF Constitution, the 14 Bonds, kites and other intercepted communications.
- Talking to other experienced gang investigators.
- Attending gang educational conferences.

- Reading numerous debriefs of active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading law enforcement reports (such as gang validation reports and gang intelligence reports) and training materials relating to NF and *Norteño* gang members.

9) In custodial settings, NF/Northern Structure gang members and Norteños write "incident reports" that document and report rules violations by other gang members. Members also sometimes conduct internal gang investigations regarding rules violations and sometimes hold hearings, which could be in person or over contraband cellphones.

The bases for this opinion are:
- Personally reviewing confiscated gang incident report kites.
- My numerous interviews with active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading confiscated NF documents, such as: NF educational materials, the NF Constitution, the 14 Bonds, kites and other intercepted communications.
- Talking to other experienced gang investigators.
- Attending gang educational conferences.
- Reading numerous debriefs of active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading law enforcement reports (such as gang validation reports and gang intelligence reports) and training materials relating to NF and *Norteño* gang members.

10) NF gang directives and rules are communicated from prison and jail within other parts of the prison or jail, to other prisons and jails, and to people on the streets in a variety of ways including: telephones, "kites," handwritten letters, third party communication, and sign language. "Kites" are miniature writings that sometimes contain or seek information about certain gang members: status, true name, date of birth, commitment offense, "clique", or housing prison. An informational message to be distributed to all NF members and affiliates is sometimes called a "filter." Communications, including kites, are passed between gang members, and are often smuggled into and out of prisons and jails by prisoners and complicit visitors.

The bases for this opinion are:
- Reading confiscated "kites."
- Listening to jail calls.
- Listening to wiretaps involving gang members.
- Reviewing the contents of confiscated contraband cellphones of NF members and affiliates.
- My numerous interviews with active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Personally viewing the behavior.

- Reading confiscated NF documents, such as: NF educational materials, the NF Constitution, the 14 Bonds, kites and other intercepted communications.
- Talking to other experienced gang investigators.
- Attending gang educational conferences.
- Reading numerous debriefs of active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading law enforcement reports (such as gang validation reports and gang intelligence reports) and training materials relating to NF and *Norteño* gang members.

   11) "Green Light" or "Green Lit" or "Green Lighted" are terms that are used when a Norteño gang member, or an entire clique, is authorized to be attacked and killed by fellow Norteños. It is the result of a violation of the rules and a finding by the gang leadership that a serious violation has occurred warranting the "Green Light." The term "Green Light" is also a general prison slang term that means to "go ahead," (i.e. certain activity can move forward). The meaning of "Green Light" can be determined from the context of its use.

The bases for this opinion are:
- Reading confiscated "kites."
- Listening to jail calls.
- Listening to wiretaps involving gang members.
- My numerous interviews with active and non-active NF and *Norteño* gang members, as well as gang dropouts, specifically about gang discipline.
- Personally viewing the behavior.
- Reading confiscated NF documents, such as: NF educational materials, the NF Constitution, the 14 Bonds, kites and other intercepted communications.
- Talking to other experienced gang investigators.
- Attending gang educational conferences.
- Reading numerous debriefs of active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading law enforcement reports (such as gang validation reports and gang intelligence reports) and training materials relating to NF and *Norteño* gang members.

   12) Criminal activity engaged in by NF, including money laundering, robbery, and narcotics trafficking, affect interstate commerce.

The bases for this opinion are:
- My personal experience working on gang investigations.
- My numerous interviews with active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading confiscated NF documents, such as: NF educational materials, the NF Constitution, the 14 Bonds, kites and other intercepted communications.
- Talking to other experienced gang investigators.

- Attending gang educational conferences.
- Reading numerous debriefs of active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading law enforcement reports (such as gang validation reports and gang intelligence reports) and training materials relating to NF and *Norteño* gang members.

  13) NF members and Norteños are supposed to pay a portion of their illicit proceeds as a "tax" or "contribution" to NF.

The bases for this opinion are:

- Listening to wiretaps involving gang members.
- My personal experience working on gang investigations.
- My numerous interviews with active and non-active NF and *Norteño* gang members, as well as gang dropouts, specifically about NF finances and illicit proceeds.
- Reading confiscated "kites."
- Talking to other experienced gang investigators.
- Attending gang educational conferences.
- Reading numerous debriefs of active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading law enforcement reports (such as gang validation reports and gang intelligence reports) and training materials relating to NF and *Norteño* gang members.

  14) Norteños identify themselves with the color red, the number "14" and/or the Roman numeral "XIV." The number "14" corresponds with the letter "N," which is the fourteenth letter of the alphabet; which, in turn, is a symbol of Northern Structure, who are NF affiliates. As with the number "14" and the Spanish word "Norteño," "Norte" is commonly, but not exclusively, displayed by Norteño criminal street gang members in tattoos, graffiti, drawings, hand signs, and on clothing as a way of displaying their affiliation, loyalty, and commitment to the gang. A "Huelga bird" may be a very good indicator of a member's association with Northern Structure which is governed by the NF. The depiction of a sombrero with a knife through it is a symbol of the NF. Only a carnal is allowed to get such a tattoo.

The bases for this opinion are:
- Personally seeing the above-mentioned tattoos and symbols.
- Personally seeing gang members displaying "14."
- Personally seeing gang graffiti, drawings, and hand signs.
- My numerous interviews with active and non-active NF and *Norteño* gang members, as well as gang dropouts, specifically about NF or *Norteño* insignia.
- Reading confiscated NF documents, such as: NF educational materials, the NF Constitution, the 14 Bonds, kites and other intercepted communications.
- Talking to other experienced gang investigators.

- Attending gang educational conferences.
- Reading numerous debriefs of active and non-active NF and *Norteño* gang members, as well as gang dropouts.
- Reading law enforcement reports (such as gang validation reports and gang intelligence reports) and training materials relating to NF and *Norteño* gang members.

Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G)(v), I approve this disclosure of my expected testimony.

EDGAR RAMOS
Senior Special Agent
Special Service Unit, CDCR

### Senior Forensic Chemist Jonathan S. Park, Drug Enforcement Administration (DEA)

The government intends to present the testimony of Jonathan S. Park, who is employed as a Senior Chemist by the Drug Enforcement Administration Western Laboratory. He is an expert in the field of analyzing and identifying the chemical composition of controlled substances. Mr. Park is expected to testify about the science, technology, and procedures for drug analysis, and about the results of his analysis in this case.

Mr. Park's qualifications are summarized in his *curriculum vitae*, which is being produced to the defense with this disclosure. As detailed in his CV, he has authored one publication in the past ten years and testified as an expert in two prior cases in the past four years: (1) *United States v. Bradley Woolard, et al*, W.D. Wash. Case No. 18-cr-00217-RSM and (2) *United States v. Fidencio Arellano Cuevas, et al.*, S.D. Cal. Case No. 22-cr-00308-TWR.

Mr. Park analyzed narcotics in this case, relying on his training, experience, and familiarity with the chemical testing procedures for controlled substances and listed chemicals, as well as the tests and analysis that he conducted on the subject substances in this case.

As a result of his analysis, Mr. Park is expected to testify that he examined, tested, analyzed, and weighed suspected cocaine and suspected heroin that was recovered from the premises on Ford Avenue in San Jose on March 29, 2019. He is expected to testify as to the methods he used to analyze and weigh the narcotics, and to conclude that the substances in question were in fact cocaine and heroin. The results of his analysis are contained in his reports, which have been produced in discovery (NF-OUT 0001639, NF-OUT 0001640, NF-OUT 0001642) and are incorporated by reference.

Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G)(v), I approve this disclosure of my expected testimony.

JONATHAN S. PARK
Senior Forensic Chemist, DEA

### FBI Digital Forensic Examiner Amanda R. Chung

The government intends to proposed stipulations to the defense, including stipulating to the authenticity of data extractions performed on various cell phones in this case. If the defense is unwilling to reach such a stipulation, then the government may call FBI Digital Forensic Examiner Amanda R. Chung or another examiner.

Forensic Examiner Chung's qualifications are summarized in her curriculum vitae, which is enclosed. Based upon her knowledge, skill, training, and experience related to electronic data extraction, including data as found on cellular devices, Forensic Examiner Chung may provide expert opinion testimony regarding: (1) her knowledge, skill, training, and experience with the extraction of data from cellular devices; (2) her extraction and/or review of the extraction process for the raw data on cellular devices seized in connection with this case that have or will be made available to you in discovery.

With respect to any extractions she conducted, we anticipate Forensic Examiner Chung's direct examination will include an explanation of the following concepts and terms, both in general and as applied to the extracted data:

1. Forensic software (software that permits engineers reliably to extract and authenticate information on digital media); and

2. The forensic copying process, including an explanation of hash values (cryptographical algorithms used to mathematically compare and authenticate data).

3. Build number (the specific version of a program).

Forensic Examiner Chung is expected to testify regarding the process for extracting the data from the cellular devices, and to provide her opinion that the data extractions are reliable and authentic, and that all data extracted from the devices were on the devices themselves. The bases and reasons for Forensic Examiner Chung's testimony are her education, training, experience, and familiarity with (i) electronic media devices including cellular devices, and (ii) cellular data extraction and authentication. This experience includes nearly 18 years working for the FBI, including her as a Special Agent and a Digital Forensic Examiner. The bases and reasons for her opinions also may include the reports of law enforcement agents involved in this investigation. In the past four years, Forensic Examiner Chung has testified as an expert witness in one case: *United States v. Abouammo*, 19-CR-621-EMC.

*   *   *

2

Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G)(v), I approve this disclosure of my expected testimony.

*Amanda R. Chung*
AMANDA R. CHUNG
Digital Forensic Examiner
FBI